**In re MISSOURI PAC. R. CO.**

No. 6935.

United States District Court
E. D. Missouri, E. D.

June 8, 1953.

As Amended July 10, 1953.

---

Russell L. Dearmont, St. Louis, Mo., for Guy A. Thompson, Trustee of Missouri Pac. R. Co., debtor.

Burton K. Wheeler and Edward K. Wheeler, Washington, D. C., for Missouri Pac. R. Co., debtor.

John L. J. Hart, Denver, Colo., for Alleghany Corp.

Charles W. McConaughy and Morris D. Crawford, Jr., New York City, and Jacob Chasnoff, St. Louis, Mo., for Group of Institutional Investors Holding First and Refunding Mortgage 5 percent Bonds of Missouri Pac. R. Co.

DeLancey C. Smith, San Francisco, Cal., for Avery Brundage et al., as Stockholders of New Orleans, Texas & Mexico Ry. Co.

Carl H. McClure, III, New York City, Putney, Twombly, Hall & Skidmore, New York City, for Protective Committee for Holders of Missouri Pac. R. Co. 5¼ percent Secured Serial Gold Bonds.

Emmet McCaffery, New York City, Dorr, Hand & Dawson, New York City, for Chemical Bank & Trust Co., trustee, Missouri Pac. Secured Serial Bonds.

Alan Kuller, New York City, Chadbourne, Park, Whiteside, Wolff & Brophy, New York City, for Manufacturers Trust Co., Trustee, First and Refunding Mortgage.

James I. Wyer, New York City, Root, Ballantine, Harlan, Bushby & Palmer, New York City, for Bankers Trust Co. as Trustee for Debtor's 5½ percent Convertible Bonds.

Orville W. Wood, New York City, Milbank, Tweed, Hope & Hadley, New York City, for City Bank Farmers Trust Co. as Trustee under International Great Northern First Mortgage.

James J. Lewis, Chicago, Ill., for Protective Committee for Holders of Common Stock of Missouri Pac. R. Co.

William H. Biggs, St. Louis, Mo., for Missouri Pacific 5¼ percent Serial Gold Bonds Committee, and Helen J. Comstock, Owner of 50 shares of Common Stock of New Orleans, Texas & Mexico Ry. Co.

Everett Paul Griffin, St. Louis, Mo., Edward F. Colladay, Washington, D. C., and Kenneth McEwen, New York City, for Protective Committee of First Mortgage Bonds of International Great Northern R. Co.

Harry Kirshbaum, New York City, for Convertible Bondholders Group, Owners and Holders of 5½% Convertible Gold Bonds of Principal Debtor Missouri Pac. R. Co.

MOORE, District Judge.

The debtor, Missouri Pacific Railroad Company, has filed a petition for permission to file an application with the Interstate Commerce Commission under Section 20b (13) of the Interstate Commerce Act, Mahaffie Act, 49 U.S.C.A. § 20b(13), providing for modification of securities. Certain bondholder groups and committees, mortgage trustees and stockholder groups of subsidiary debtors have filed answers in opposition thereto, a hearing has been held, briefs filed, and the Court has heretofore entered an order denying the petition.

This petition comes at a time when the Commission was about to hold hearings under Section 208 of the Bankruptcy Act, 11 U.S.C.A. § 608, for possible modification of the plan of reorganization approved by the Commission in 1949 under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The 1949 plan, as approved by this Court and the Court of Appeals (also certiorari was denied by the Supreme Court) involved a reorganization and consolidation of Missouri Pacific Railroad Company with two subsidiary roads, New Orleans, Texas &

Mexico and International-Great Northern, also subsidiary debtors herein. The petition here contemplates the modification of the securities of Missouri Pacific alone as any consolidation or merger is not contemplated by Section 20b. Therefore it is immediately apparent that the granting of this petition would suspend the reorganization of the subsidiary debtors for a period up to a year (and up to 18 months under pending legislation), and could possibly result in the loss of the subsidiaries to the Missouri Pacific System.

The petitioner, argues, however, that the only function of this Court under Section 20b(13) is to determine whether the requisite number of assurances of acceptance, satisfactory in form, have been obtained from security holders, without any consideration whatsoever of the merits or demerits of the plan.

The statute provides: " * * * Any such carrier applying for permission to file such application shall file with the court as a prerequisite to the granting of such permission (1) a copy of the proposed application, (2) a copy of the proposed plan of alteration or modification of its securities, and (3) assurances satisfactory to the court of the acceptance of such plan from holders of at least 25 per centum of the aggregate amount of all securities, * * *."

It is true that the statute does not cast upon the Court the duty of approving or disapproving the plan and that this burden is eventually placed upon the Commission, but I believe that Congress intended that the Court do more than merely count the assurances of acceptance, and that the reason for requiring the permission of the reorganization court was the familiarity that court would have with debtors in its care, and hence the implication that the Court was to exercise some discretion over plans which are required to be filed with it.

The plan in general calls for the payment of some 170 million dollars in defaulted interest on the bonds by the payment of about 84 million in cash and the distribution of some assets of the debtor (including the issuance of new securities); lowering the interest rates on some bonds to 4% and

extending some maturities; the creation of a new preferred stock to cover par and accumulations on the old preferred; and the common stock to remain outstanding but with $100 par reduced to stated value of $10 per share.

The opponents of this plan argue that it is wholly impracticable, that the execution of it would leave the debtor with a cash deficit, whereas a 20 million dollar working fund is required, that it unnecessarily incurs heavy income taxes, and that it could possibly break up the Missouri Pacific as a System.

Passing from the merits of the plan to the matter of the assurances of acceptance, it is contended by the opponents that the assurances are not in proper form, that they were obtained by the use of false and misleading statements in solicitation material and by the use of a force of solicitors; and that the procedures used in the distribution of the solicitation material were so lax as to permit duplicate voting; all rendering the assurances of acceptance invalid and ineffective.

. ▇▇ The petitioner here argues that the court has no jurisdiction to inquire into the solicitation material because Section 20b(2) gives this duty to the Commission, and that the Commission's Bureau of Finance actually did approve the material in this case. However Section 20b(2) by its terms seems to apply only to Commission approval of solicitation material for "assents" of security holders to a 20b plan after Commission approval and on final submission. It does not apply to the "assurances * * * of the acceptance" which must be "satisfactory to the court" under Section 20b(13). This interpretation is apparently made also by Commissioners Splawn and Mahaffie in letters to a Senate Committee concerning proposed legislation, wherein they recommend that the Commission be given supervision of solicitation material for preliminary "assurances" as well as final "assents".

Furthermore, it is quite doubtful that the Commission's Bureau of Finance actually did approve the solicitation material used in this case. The debtor sent out a letter dated January 29, 1953, together with a separate form of assurance, which were thereafter submitted to the Commission's Bureau of Finance. The Director of that Bureau, noting that the material should have been submitted prior to distribution, stated that the whole matter should be resubmitted to the security holders and required that certain changes, corrections and additions should be made in the material. Thereafter the debtor sent out a second letter dated February 27, 1953 embodying the changes required by the Bureau, but without any new form of assurance. The Bureau stated it had "no objection" to this material. However, as stated by the debtor in the February 27th letter, there had been received prior to its issuance 138% of the required 25% assurances in response to the January letter and oral solicitation. The debtor has filed in court and now relies on these assurances, which together with others subsequently received amount to over 4000 in number and to 44% of the aggregate amount of debtor's securities including 40% of the creditors' claims.

Thus less than 10% of the security holders of the debtor signified their assurances after receipt of the February letter; or stated another way, more than 75% of the assurances were obtained before the second letter went out.

The opponents of the plan have pointed out serious misrepresentations and omissions in the solicitation letters, including some that were not corrected by the February letter.

The January 29th letter stated:

"First, let us examine the solvency of the MOP. The pro forma balance sheet of the MOP as of December 31, 1952, based on actual operations for 10 months and estimated operations for 2 months, and after satisfying all claims figured to the same date, indicates clearly the sound condition of the company. There is ample cash left on hand and a strong surplus account. During the past year and currently, cash is accumulating at the rate of $45,000,000 annually, despite the huge expenditures being

made for improvements. * * * There is much cash lying dormant in the treasuries of subsidiaries which can readily be utilized for the benefit of bondholders."

"During 1952 the First and Refunding bondholders received $44,638,100 of cash in payment of past due coupons. Nevertheless cash now on hand approximates $100,-000,000."

The pro forma balance sheet referred to was not sent with the letter and was subsequently disapproved by the Bureau of Finance. It was produced in court and shows on its face that it was based on the December 31, 1951 balance sheet unadjusted for transactions in 1952 other than estimated cash accumulations. It has written up the investments in affiliated companies by almost 46 million dollars, directly contrary to applicable Commission Accounting Rules.

A pro forma balance sheet prepared by the Chief Accounting Officer to the Trustee putting the Debtor's plan into effect at December 31, 1952 points out additional errors in the Debtor's pro forma balance sheet and indicates a deficit cash position and a surplus which would be a deficit except for the reduction of the par value of the common stock.

The Debtor's pro forma balance sheet increases cash by some 48 million dollars, arrived at by an erroneous estimate of the last two months' earnings in 1952 and in addition adding back in excess of 11 million dollars charged to depreciation. At the hearing, Debtor's Chairman of the Board said this 48 million dollar figure was "rounded off" to 45 million. The actual earnings for the year were 32.8 million dollars prior to deduction of fixed charges, and over 17 millions were expended for capital improvements exclusive of borrowings. This gross misrepresentation was only partially corrected by the inclusion of the 1952 income account as filed with this court in the February letter.

The statement of cash on hand as 100 million was also a misrepresentation. Debtor's Chairman attempted to justify this by reference to the November 30, 1952 balance sheet and an estimate of earnings for December. Even this only totalled about 95 million and he knew at the time that more than 11 million was paid to First and Refunding bondholders in December. The materiality of this representation cannot be doubted in view of the plan's requirement of 83 million in cash for defaulted bond interest.

There were other misrepresentations and omissions in the January letter with which I will not burden this memorandum.

The Debtor gave wide distribution to its January letter and form of assurance. Copies were distributed at a "Town Meeting" in New York City, were handed out in "sheafs" to brokers in New York, and were mailed to all 4700 members of the National Association of Security Dealers. Admittedly inaccurate lists of security holders were also used for mailing purposes.

The form of assurance did not call for the certificate number of shares voted nor the serial number of bonds, and no record date was set for the balloting. Thus it was virtually impossible to check the authenticity of any of the assurance forms.

In view of all these circumstances the Court cannot find that the assurances of acceptance filed herein are satisfactory. The Debtor's plan would, in my opinion, require drastic revision in order to prevent the company from becoming an immediate candidate for a new Section 77 proceeding. In view of its violation of the principle of a system reorganization, found by the Commission and the Courts to be in the public interest, I believe that the submission of this plan to the Commission could do nothing more than delay the final confirmation of a plan in the Section 77 proceedings.

An order denying the petition has heretofore been entered.